Jones, Chief Judge,
delivered the opinion of the court:
Seven separate cases have been consolidated in this proceeding. Two have been dismissed by stipulation. Four of the remaining cases involve several claims by John A. Hadden as trustee for Manufacturers Trading Corporation and the Government’s counterclaims thereto. We shall take them up separately, discussing the fifth case at the end of the opinion. The facts are naturally complicated and the procedure difficult.
First, some of the claims have already been decided or are conceded. In Case No. 49884 (Contract NOrd-7426, Item No. 2) defendant has conceded that the plaintiff is entitled to recover $63,000. Hadden v. United States, 123 C. Cls. 246. Furthermore, in Case No. 413-52 the defendant concedes its indebtedness to plaintiff for overassessment of taxes in the amount of $231,276.61 with interest as provided by law. In Case No. 48867 (Contract UNR-TPs-2786) the Government also concedes an unpaid obligation of $248,375.
There remains the claim in Case No. 50115 where, under Contract NOrd-7426, Item No. 1, there is due Manufacturers Trading Corporation $113,417 if its contention is correct, or $8,879.83 if defendant’s contention prevails. Contract NOrd-7426 originally was made between the Bureau of Ordnance of the Navy Department and Canonsburg Steel & Iron *330 Works Division of Union Mining Company, subsequently known as Union Industries, Inc. (hereinafter sometimes referred to as Union). Union’s contract called for the manufacture of 400,000 five-inch rocket bodies at a total price of $5,020,000. Under a financing agreement with the now bankrupt Manufacturers Trading Corporation (herein sometimes described as MTC), Union assigned all moneys due or to become due under this contract to MTC. The defendant does not dispute that the assignment was made in accordance with the applicable law and is valid.
The contract was subsequently terminated by the Government and the issue is whether it was terminated for default under section 23 of the contract or for the convenience of the Government under section 24. The parties agree that if the latter is the case more compensation is due the plaintiff than under the former hypothesis.
The parties entered the contract about November 1, 1944, and by March of the following year the Navy advised the contractor of its failure to perform satisfactorily. The Navy issued a further reminder to this effect and revised the production schedule on June 8. The Navy then decided to cancel the contract for default. In a conference on June 27, 1945, with the contracting company which had recently come under new management, the Navy and the company agreed, in order to save face for the new management, to cancel the contract for the convenience of the Government upon the express understanding that the contractor would only be permitted to submit in its termination claim (1) tooling costs and (2) its inventory of existing special material.
In a letter of July 2, 1945, one of the managers of the Canonsburg Division of Union, referring to the conference of the 27th of June, made the formal proposal that all work on the contract cease (except for work in progress), that termination be on the basis of paying the contractor for all tooling costs and special materials and that an advance be made to the contractor on this basis. The Navy acknowledged this communication and replied that termination for the convenience of the Government would be instituted upon receipt of approval by Union’s directors of the proposed procedure. Shortly thereafter the Navy was advised by a *331 representative of the Canonsburg Division that Union’s board of directors had approved the agreement of the 27th.
There followed a series of communications and instructions which indicate that the Government was proceeding as though the termination had been for the convenience of the Government. Finally, on February 14,1947, the Navy withdrew its previous notice of termination for the convenience of the Government, saying the conditions agreed upon at the June 27 conference had been inadvertently omitted therefrom, and issued a notice of termination for default. The dispute as to what type of termination had been made came before the Armed Services Board of Contract Appeals which held in favor of the Government; it found that the agreement had been made at the conference to restrict compensation to the formula applicable to terminations for default, that the letter of July 2 was reasonably understood by the Navy as confirming that agreement, and that the Navy’s reply was made with that understanding. There being no allegation that these findings were arbitrary, capricious, or not supported by substantial evidence, they are binding on us to the extent that they involve disputed facts.
The contentions made, however, primarily turn on questions of law. The plaintiff relies on the terms of section 23 of the contract which reads in part:
Termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance under this contract shall be terminated, and the date upon which such termination shall become effective.
There is no doubt that Union never received such a notice until 1947. On the other hand, the fact that no such notice was delivered can hardly be raised by the party at whose request the Government refrained from issuing such a notice.
Sections 23 and 24 provide varying bases for compensating contractors whose contracts had been terminated. The agreement of June 27 restricted the contractor’s compensation to what is allowed for termination for default under section 23. In the later stages of the correspondence Government instructions and termination proposals made by the *332 plaintiff were made on the much more generous grounds allowed under section 24. They included compensation for work in progress, administrative expenses, profits, etc. This was in accord with the part officials of the Government had agreed to play. Nevertheless, the defendant never paid more than it was required to pay under section 23; in fact, if the defendant’s contention is sustained, the Government still owes the contractor over $8,000. Thus the Government did not act inconsistently with the agreement of June 27 that the termination would ostensibly be for the convenience of the Government even though the compensation would be limited to the terms of section 23.
The plaintiff also argues that the communications between Union and defendant subsequent to Union’s letter of July 2 amounted to an offer for termination for the convenience of the Government on the part of the Government and its acceptance by Union, thus constituting a contract. The plaintiff then relies on the parol evidence rule to exclude any evidence of the prior oral agreement of the 27th of June. The plaintiff’s position is not tenable. In the first place, termination by the Government in this case is not properly subject to contract. Termination here is a unilateral act by the Government which it may undertake at any time for its own convenience, or, if the contractor defaults, for his default. The Government is only required to properly signify its intention, to properly signal the jural act which it wishes to take. This it did on the 27th of June. None of the Navy’s subsequent written communications was inconsistent with that first jural act, nor did the Government attempt to withdraw its original act, as was the case in Line Construction Company v. United States, 109 C. Cls. 154. The parol evidence rule would apply if the act had been executed by signing a specific and complete document, but it was executed here by an oral communication.
For these reasons we hold that the contract was terminated for default or pursuant to an understanding that compensation would be limited to the liabilities that would be incurred in a termination by default. There is no allegation that this termination was not deserved, nor that the facts are not as the Board of Contract Appeals has found them. The de *333 fendant, therefore, owes the plaintiff only $8,879.83 on this contract.
Originally the defendant’s counterclaims against MTC were largely restricted to derivative liabilities based on Government claims against Union. These claims against Union totaled $2,517,872.69, consisting of $1,085.15 balance under renegotiation of a Government contract, $140,553 for excess profits, $507,706.91 for materials and supplies furnished by the Government under a Government contract, and $1,868,-527.63 for income and excess profits taxes remaining unpaid. The plaintiff does not dispute the fact that Union is liable in these amounts, but insists that they cannot properly be set off against the claims of MTC.[1]
In the beginning the defendant claimed that MTC was Union’s successor in interest and thereby became liable for all of Union’s debts. Defendant has now abandoned this position. The defendant presses its counterclaims' based on the fact that MTC claims by virtue of assignments from Union. All the contracts except the one involved in Case No. 48867 contain clauses which prohibit the Government from asserting claims against the assignees of the contracts where such claims are based on independent transactions with the assignor. The defendant’s counterclaims originated in transactions with Union, independent of the contracts upon which MTC here seeks to recover. To the extent that the counterclaims are based on the theory of assignment they must fall, with the exception of the aforementioned contract in Case No. 48867.
That contract involved the United Nations Relief and Rehabilitation Administration (UNEEA) program. It did not contain a clause saving any assignee thereunder from setoff by the Government. The plaintiff concedes that it must allow a counterclaim on this contract unless we determine that the Government acted as agent for UNEEA in executing the contract, or unless the plaintiff has an equitable lien on funds appropriated for UNEEA purposes.
*334 From the facts and documents related in our findings, it appears that UNRRA was an international organization formed during World War II for relief and rehabilitation of recently liberated areas. It pooled the resources of the United Nations and other powers to be used for relief purposes and planned and coordinated their distribution. Member governments were to contribute to the support of UNRRA and the accomplishment of its purposes as their appropriate constitutional bodies should authorize. Finding 49 lists the appropriations Congress made for UNRRA purposes during the years 1944, 1945, and 1946. By the terms of the agreement between the member governments which created UNRRA, UNRRA had power to acquire, hold and convey property, to enter into contracts and undertake obligations, and in general to perform any legal act appropriate to its objects and purposes. Nevertheless, at its first session in 1943 UNRRA adopted the policy of obtaining its supplies wherever possible through the established procurement agencies of member governments.
Pursuant to this policy UNRRA relied upon the procurement services of the United States Government to obtain machinery for making glass jars; This was the subject matter of the contract in Case No. 48867, Contract UNR-TPs-2786, concluded between Amsler-Morton Division of Union Industries and the Procurement Division of the United States Treasury Department. The facts in connection with this contract develop as follows:
UNRRA wrote Amsler-Morton that “for budgetary and planning purposes” it desired to receive quotations, terms, etc., on machinery for making wide-mouth glass jars. Amsler-Morton Division replied giving its figures. UNRRA then addressed a requisition to the United States Government specifying the nature of the machinery required. This requisition (also called a “request to supply”) contained the suggestion that “equipment on this requisition be purchased from Frazier-Simplex, Inc., Washington, Pennsylvania.” Under “Source of Funds” the requisition stated “It is understood that UNRRA undertakes to accept the above supplies subject to compliance with specifications and that upon delivery to UNRRA the total cost of such supplies - is to be *335 considered part of the contribution of the United States Government to UNKRA.” By its Commitment Letter No. 467 the State Department designated the Treasury Department as authority to procure these supplies. The letter does not clearly show what funds were to be used in procuring the supplies, but it may be assumed that funds appropriated by Congress for the benefit of UNKKA were intended. The letter also authorized the Treasury to transfer these materials to UNKKA and authorized UNKKA to export them.
The Treasury, in its turn, requested and received quotations from Amsler-Morton Division for the machinery. After some further correspondence, the Treasury and Amsler-Morton Division of Union Industries entered into Contract UNR-TPs-2786, dated August 8, 1946. The contract was fully performed by Amsler-Morton Division and the machinery accepted by the authorities of UNKKA. The defendant, however, has not yet paid for these supplies, and now refuses to pay MTC on the ground that it is entitled to set off sums which MTC’s assignor, Union, owes the Government.
Plaintiff denies the Government’s right to setoff, alleging that the Government acted in the role of agent for UNKKA. The plaintiff argues that, for this reason, the debts by the United States to the plaintiff and the demand by the Government against the plaintiff are not of the same character, hence not mutual, and therefore not properly set off the one against the other. The plaintiff also contends that the moneys appropriated for UNRKA were a special fund upon which the suppliers of UNKKA material have an equitable lien. Plaintiff makes much of the fact that MTC took the assignment being well aware of the absence of a clause in this contract prohibiting setoffs, of the fact that the supplies were to be produced for UNKKA and to be paid for from appropriations made for UNKKA. Plaintiff concludes that MTC relied on these latter facts as a substitute for a no-setoff clause, and that MTC’s reliance was justified.
We do not think that the United States acted as agent for UNKKA in procuring the machinery here in question. The United States acted in concert with and at the request of UNKKA; but there is nothing to indicate that UNRKA had *336 any right to control the actions of the defendant when it was procuring supplies for UNRRA or that it was bound by the actions of the defendant. Nor does it appear how UNRRA is liable under the present circumstances as principal contracting party. UNRRA’s requisition (“request to supply”) suggested the equipment be purchased from Frazier-Simplex, Inc., Washington, Pennsylvania. The United States bought elsewhere. It was merely a suggestion in a “request.” This hardly sounds like the dealings one usually finds between principal and agent.
The UNRRA request indicated that upon delivery to UN BE A the cost of such supplies was to be considered a part of the contribution of the United States. Had the supplies been undelivered or destroyed prior to delivery, the defendant assumed this risk in relation to UNRRA. The defendant assumed the burden of contributing its services when it agreed to the UNRRA policy of using the procurement agencies of member governments. The commitment of the United States was to contribute a certain amount of money either directly or in supplies. When it made the contribution in supplies, there was no contribution, no discharge from defendant’s commitment to UNRRA, until UNRRA received the supplies. When the United States contracted for the machinery it did so on its own account, for the purpose of obtaining machinery to be contributed by it to UNRRA, and not as mere agent for UNRRA.
Nor can we find that there is a fund on which the plaintiff can claim an equitable lien. In the first place, such liens are ordinarily created by agreement. Ketchum v. St. Louis, 101 U. S. 306; Walker v. Brown, 165 U. S. 654; United States v. Butterworth-Judson Corp., 267 U. S. 387. There is nothing whatever in the contract between the Treasury Department and Union to suggest that the Government agreed to such a lien. It is true that the contracting parties must have been aware of the fact that the supplies were destined for UNRRA and were to be paid for out of UNRRA appropriations. But even such an implied reference to the appropriated funds could hardly suffice to create a lien unless the terms of the appropriations made this intention amply clear.
The contrary is true. In essence, the relevant appropria *337 tion acts, 58 Stat. 629; 59 Stat. 609; 59 Stat. 632, 634; 60 Stat. 221, 228; 60 Stat. 600, 603, use the formula “to enable the President to carry out the provisions of-the act of March 28, 1944 (Public Law 267) ” [58 Stat. 122, as amended, 59 Stat. 612, 50 U. S. C. App. 1571 et seq. (1946 Ed.)]. This latter act embodies the agreement establishing UNRRA and authorizes appropriations to the President for United States participation in the UNRRA program. The agreement under Article Y contemplated contributions in both supplies and resources. The policy of procurement through member governments had been established prior to the Congress’ authorizing legislation. The President could, therefore, disburse funds directly to UNRRA or he could disburse supplies. Perhaps UNRRA might request which course he should pursue. But there is nothing to indicate a lien in favor of Government contractors who furnish supplies, when the President makes the contribution in that manner.
But even if we should regard the appropriations' as nothing more than a drawing account that Congress set up for UNRRA, we cannot find anything to show that UNRRA created a lien on this account in favor of contractors supplying material to the United States for use by UNRRA. As we have noted, UNRRA did not have a contractual relation to Union. Furthermore, UNRRA has done nothing which might be construed as an agreement to create a lien in favor of Union. There is, therefore, no lien in favor of Union or its assignee MTC, and the Government’s counterclaim to the claim in Case No. 48867 must be allowed to the amount of that claim.
Defendant’s remaining counterclaim against plaintiff is one against plaintiff in his own right, not by virtue of assignment or succession. It involves the question of fraudulent conveyances; whether plaintiff was either a conveyee or otherwise a guilty participant in such conveyances.
The facts on this branch of the case, stripped of unnecessary complications, present the following picture. The complex of enterprises now known as Union Industries, Inc., was formed in 1944 by consolidating several independent corporations. During 1945 Union was primarily engaged in the performance of Government contracts but its business *338 also consisted of engineering, manufacturing and installing work for commercial customers. Two stockholders, Annan and McKelvy, held almost all of Union’s stock.
In 1945 one Alfred H. Sachs owned more than one-half of the common stock of MTC and was its president. Sometime in the first half of 1945 Sachs entered upon negotiations with the owners of Union with a view to acquisition of Union by certain proposed purchasers represented by Sachs. The record does not show the details of these negotiations or what parties took part in them. Incident to this Sachs made an investigation of Union’s financial condition. The negotiations culminated in a multiple deal which was finally consummated on June 15, 1945, and during the succeeding two months.
The following is a skeletal record of what transpired in this deal. Sachs and two associates had formed the Globe corporation, Sachs owning 40 percent of Globe’s $15,000 total capital stock. Globe received a loan of $315,000 from Pittsburgh Finance Corporation which was controlled by one of Sachs’ two associates in Globe corporation. Pittsburgh Finance Corporation had at about that time received a loan of $250,000 from MTC. Globe used the money it thus raised to pay Annan and McKelvy $312,954 for their stock in Union. Having acquired control of Union, Globe issued $300,000 of its own debentures to Union for which Union paid in cash. Globe then proceeded to pay off its loan to Pittsburgh Finance Corporation which in turn paid its debt to MTC. The net result of this series of transactions was to transfer $300,000 of Union’s cash assets to Annan and McKelvy and to put Sachs and his associates in control of Union. The worth of the bonds Globe had given to Union can be gauged from a list of Globe’s assets after it had bought Union: less than a thousand dollars cash and the stock of Union.
At the time of the stock deal and probably made in contemplation of it, several other transactions occurred between Union and its old owners, Annan and McKelvy. A brick plant with a book value of $876,000 was sold to them (through a strawman) for $100,000. There is little evidence of its actual value and what evidence there is indicates that *339 the plant was worth much less than its book value. An airplane and a brick inventory were sold to them at a price of about one-half the book value. In addition, McKelvy received $200,000 cash and $200,000 in notes, which were secured by patents, for a $400,000 mortgage which he held on the brick plant.
There is considerable evidence in the record that Union was in a weak financial position, if not insolvent, at the time all these transactions occurred, but we do not find it necessary to determine the question of insolvency one way or the other. Sachs was evidently not deterred by these facts, and thought that he could turn the enterprise into a moneymaking proposition, for on June 15, 1945, MTC made a “factoring agreement” with Union whereby MTC was to loan to Union 75 percent of the value of all acceptable receivables of Union, secured by assignment of such receivables. Moreover, Sachs and his two associates in Globe corporation loaned $100,000 of their own money to Union, with Pittsburgh Finance Corporation and MTC acting as intermediaries.
MTC continued lending Union large amounts over the next several years but, in the end, Union failed to prosper. Its operation ceased early in 1947. By November 30, 1950, Union owed MTC an unpaid balance of $1,131,715.49, representing both unpaid interest and principal. Sachs and his associates also were able to recover only a part of their $100,-000 loan to Union. The United States, a heavy creditor of Union throughout the whole period since 1944, remained impaid. Eventually MTC went bankrupt.
The transactions most relevant to this part of the case may then be summarized as follows. Annan and McKelvy received $312,954 for their stock in Union; this money was derived from Union and represented, in effect, a partial liquidation in their favor. They received an uncompleted brick plant and other assets of Union at a great discount from their book values. Union also settled fully on a $400,000 obligation it owed to McKelvy. MTC made advances to Union under a “factoring agreement” whereby Union was to assign all acceptable receivables to MTC and MTC would lend 75 percent of their value to Union.
*340 The question raised at this point is whether MTC is in any way liable to the creditors of Union (among whom is the United States) for its participation in any of the aforesaid transactions. Defendant relies in the main on the theory of conveyances in fraud of creditors. Only one of the transactions, the “factoring agreement” and assignments made in pursuance thereof, resulted in transfer of assets to MTC. From the available evidence it is not entirely clear whether this transaction is governed by the laws of Maryland, Pennsylvania, or Ohio. We need only decide, however, that the transfer was not fraudulent in relation to Union’s creditors under the laws of any of these states. MTC gave fair consideration for what it received and Union’s estate was not unfairly diminished as a result of the “factoring agreement” or assignments made upon it. Such conveyances, not being fraudulent, cannot be set aside.
Defendant also seeks to assert a claim in tort against MTC for having taken part in allegedly fraudulent conveyances from Union to third parties. In regard to the settlement of McKelvy’s $400,000 obligation, MTC cannot be liable for its participation since this transaction did not amount to a fraudulent conveyance in any event. The cancellation of the preexisting debt was fair consideration. At the very most that transaction amounted to a preference of a creditor but MTC need not respond in damages for participating in such a plan. Duell v. Brewer, 92 F. 2d 59.
Plaintiff’s liability, if any, in regard to the remaining transactions to be considered is one in tort also. There is some difficulty as to the applicable law. If we apply the Federal law on the question, the rule is settled that no action lies in tort for aiding another in a fraudulent conveyance. Adler v. Fenton, 24 How. 407; Duell v. Brewer, supra. No Maryland statute or adjudicated Maryland case has come to our attention which decides whether or not those aiding a fraudulent conveyance are liable in tort. We may properly, therefore, apply the rule accepted by the weight of authority, particularly also the rule in the Federal courts. Generally no such action is recognized. Duell v. Brewer, supra.
Ohio and Pennsylvania, on the other hand, do have such an action. Iddings v. Whitacre, 1 Ohio App. 223; Mott v. *341 Danforth, 6 Watts 304; Penrod v. Mitchell, 8 Sarg. & R. 522. But even there the decided cases involved schemes with an actual intention of hindering or delaying creditors, not merely technical fraudulent conveyances, i. e., conveyances fraudulent merely because causing or increasing the debtor’s insolvency.
Aside from any question of the applicable rule of law, we do not find here sufficient facts to sustain a cause of action. The evidence does not justify a finding that MTC had knowledge at the time of the transactions that Union was insolvent, or would be rendered insolvent thereby. The evidence on insolvency is itself somewhat indeterminate if we apply the appropriate test that the then present, fair, salable value of the assets was less than the amount that would have been required to pay the probable liability on existing debts as they would become absolute and matured. In addition, not all the means of proof which we now have on this point were available to MTC at the time it participated in these dealings.
MTC made large loans to Union immediately after the dealings of which defendant complains. It is unlikely that it would have made these loans unless it felt that the outstanding commercial and Government contracts which Union then had in hand, together with its other assets, made Union a going concern whose solvency had not been jeopardized by these dealings. On this phase of the case we must find against the defendant’s contention.
Plaintiff is entitled to recover $63,000 in Case No. 49884; $231,275.61, with interest as provided by law, in Case No. 413-52; $8,879.83 in Case No. 50115; and $248,375 in Case No. 48867. Defendant is entitled to recover $248,375 as an offset in the amount of plaintiff’s claim in Case No. 48867. The defendant’s remaining counterclaims in this and the other cases are dismissed. Judgment, therefore, is entered in favor of John A. Hadden, Trustee for Manufacturers Trading Corporation, in the net amount of $303,156.44.
There remains one further problem. The consolidated cases now before us originally included the following individual petitions:
*342 Case No. 48867, filed September 24,1948
Case No. 49034, filed February 25,1949
Case No. 49831, filed September 27,1950
Case No. 49884, filed October 26,1950
Case No. 50008, filed January 19,1951
Case No. 50115, filed April 19,1951.
Later Case No. 413-52, filed August 7, 1952, was added. Hadden, trustee for MTC, or MTC are tlie only parties plaintiff in all except two of these petitions. In Case No. 49034 Union originally appeared as plaintiff but on December 13, 1950, a motion to substitute Hadden as plaintiff was allowed in that case. In No. 49831 both Union and Hadden sued as plaintiffs.
On October 12,1950, the defendant filed a general traverse in Case No. 49831. On December 13,1950, the case was consolidated with No. 48867 where Hadden was the only plaintiff. During the next year defendant filed six counterclaims in Case No. 49831, of which all but the fourth were made against both Union and Hadden. The fourth was against Hadden alone. Union filed replications to each of the counterclaims. On October 31, 1951, No. 49831 was consolidated with still other cases.
When the consolidated cases came to trial, Union was not represented by counsel. Counsel for Hadden admitted the liability of Union on the issues involved in counterclaims 1, 2, 5, and 6 to Union’s petition in No. 49831 and also admitted Union’s liability on the issue involved in part of the third counterclaim in that case. We do not think that the admissions by counsel for Hadden have a binding effect on Union.
On October 13,1953, there was filed with the court a stipulation under the heading of Case No. 49831 providing that “the attorneys for the respective parties do hereby stipulate that the petition of the plaintiff and each and all of the counterclaims of the defendant may be dismissed.” This document was signed by Arter, Hadden, Wykoff, and Van Duzer, attorneys for plaintiff, and by Wm. A. Stern II and Warren E. Burger on behalf of the Government. It operated to cause a dismissal of the petition of Hadden and the defendant’s counterclaims made thereto. (Cases Nos. 49034 *343 and 50008 which involved only the United States and Hadden were dismissed pursuant to similar stipulations filed on that same date.) The stipulation in Case No. 49831 did not bear the signature of Samuel K. Walzer, attorney of record for Union, or of anyone else purporting to act for Union. Union’s petition is, therefore, still before us, as are the counterclaims made thereto.
Neither Union nor the defendant has introduced any evidence on the respective claim and counterclaims. We will withhold entry of judgment for a period of thirty days to afford the parties an opportunity to signify an intention to produce evidence upon the claims of Union and the counterclaims against Union in Case No. 49831. If no further steps are taken in this matter within that period both the claim of Union and the counterclaims against Union will be dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
The following cases were consolidated upon motion duly allowed by this court November 11,1951 :
No. 48867, filed September 24,1948
No. 49034, filed February 25,1949
No. 49831, filed September 27, 1950
No. 49884, filed October 26,1950
No. 50008, filed January 19,1951
No. 50115, filed April 19, 1951
Case No. 413-52, filed August 7, 1952, was later combined with the other cases reported herein. Upon a stipulation of the parties October 13, 1953, the plaintiff’s claims and defendant’s counterclaims relating thereto were dismissed in respect to cases Nos. 49034, 49831 and 50008.
*344 Case No. 50115 {Contract NOrd-7J$6 — Item No. 1)
1. John A Hadden is the duly appointed, qualified and acting Trustee in Bankruptcy for Manufacturers Trading Corporation, a bankrupt.
2. Manufacturers Trading Corporation was a commercial finance company, doing commercial banking, substantially all on a security basis.
3. On or about November 1, 1944, a contract in writing, known as NOrd-7426, was duly entered into between the Bureau of Ordnance of the Navy Department of the United States and Canonsburg Steel & Iron Works Division of Union Mining Company of Allegheny County.
4. After November 1, 1944, the corporate name of Union Mining Company of Allegheny County was changed to Union Industries, Incorporated.
5. Under the terms of NOrd-7426, Union Industries, Inc., (hereinafter called Union) agreed to manufacture 400,-000 5-inch rocket bodies at a price of $12.55 each, or a total price of $5,020,000.
6. Section 8 of said contract NOrd-7426 provided that, if the contract was not classified as “confidential” or “secret,” and if it provided for payments aggregating $1,000 or more, claims for money due or to become due to the contractor from the Government arising out of said contract might be assigned to any bank, trust company or other financing institution; that any such assignment should cover all moneys payable under said contract and not already paid, and should not be made to more than one party, except that any such assignment might be made to one party as agent or trustee for two or more parties participating in the financing of said contract; that in the event of any such assignment the assignee thereof should file written notice of the assignment, together with a true copy of the instrument of assignment with (1) the General Accounting Office of .the Government, (2) the contracting officer, (3) the surety or sureties upon the bond or bonds, if any, in connection with said contract and (4) the disbursing officer designated to make payment under said contract; that payments to an assignee of any claims arising under said contract should not be subject to *345 reduction or setoff for any indebtedness of the contractor to the United States arising independently of said contract*
7. Contract NOrd-7426 was not classified as “confidential” or “secret.”
. 8. Union duly assigned to Manufacturers Trading Corporation (hereinafter called MTC) all moneys due or to become due under contract NOrd-7426.
9. Upon the assignment by Union to MTC of all moneys due or to become due. under Contract NOrd-7426, the assignee duly filed written notice of such assignment together with a true copy of the instrument of assignment with the General Accounting Office of the Government, the contracting officer, and the disbursing officer designated to make payment under said contract, all in full compliance with the provisions of section 8 of said Contract NOrd-7426.
10. Section 23 of contract NOrd-7426 provided as follows:
Section 23. Termination for default. — (a) The performance of work under this contract may, subject to the provisions of paragraph (a) of Section 24, entitled “Termination at the Option of the Government,” be terminated by the Government in accordance with this Section in whole, or from time to time in part, whenever the Contractor shall default in performance, or shall so fail to make progress in the prosecution of the work hereunder as to endanger performance, of this contract in accordance with its terms and shall fail to cure such default or failure within a period of 10 days or such longer period as the contracting officer may allow after receipt from the contracting officer of a notice specifying the default or failure. Termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance of work under this contract shall be terminated, and the date upon which such termination shall become effective.
(b) After receipt of a Default Notice of Termination and except as otherwise directed by the contracting officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Default Notice of Termination; (2) assign to the Government, in the manner and to the extent directed by the contracting officer, all of the right, title and inter *346 est of the Contractor under orders or subcontracts to the extent that they relate to the performance of any work terminated by the Default Notice of Termination; (3) to the extent not required for the performance of work under this contract not terminated by the Default Notice of Termination transfer title and deliver to the Government in the manner, to the extent and at the times directed by the contracting officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or acquired in respect of the performance of the work terminated in the Default Notice of Termination, (ii) the plans, drawings, information, and other property which, if the contract had been completed, would be required to be furnished to the Government and (iii) jigs, dies, fixtures, and other special tools and tooling acquired or manufactured for the performance of this contract; (4) complete performance of such part of the work as shall not have been terminated by the Default Notice of Termination; and (5) take such action as may be necessary or as the contracting officer may direct for protection and preservation of the property, which is in the possession of the Contractor and in which the Government has or may acquire an interest.
(c) In addition to its other remedies, the Government may, with respect to work terminated as permitted in this Section, purchase in the open market, or otherwise obtain articles of a character similar to those called for under the contract and in a quantity which, together with the completed articles delivered by the Contractor and accepted by the Government, shall not exceed the total quantity called for under this contract. If the cost to the Government of the articles so procured exceeds the price fixed for such articles under this contract, the Contractor, and its surety, if any, shall be liable for such excess.
(d) Upon termination of work pursuant to this Section the Government shall pay to the Contractor the following amounts:
(1) For completed articles delivered to and accepted by the Government and not theretofore paid for, a sum equivalent to the aggregate price for such articles computed in accordance with the price or prices specified in the contract;
(2) For parts, work, supplies, material, plans, drawings, information, jigs, dies, fixtures, special tools and tooling, and other property, title to which is transferred and delivery of which is made pursuant to paragraph
*347 (6) (3), the amount agreed upon by the Contractor and the contracting officer, or, in the event of failure to agree upon an amount, the costs of such property at the adjusted basis thereof for Federal income tax purposes or its fair value, whichever is the lesser;
(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (5) (5) hereof.
(e) The obligation of the Government to make any payments under this Section (1) shall be subject to deductions in respect of (i) all unliquidated partial or progress payments, payments on account theretofore made to the Contractor and unliquidated advance payments (ii) any claim which the Government may have against the Contractor in connection with this contract, and (2) in the discretion of the contracting officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order is related to the performance of this contract.
(/) This contract shall not be terminated and the Contractor shall not be charged with any liability to the Government under the provisions of this Section where the default or failure of the Contractor is due to causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to (1) acts of God or of the public enemy, (2) acts of the Government of the United States or any State or political subdivision thereof, (3) fires, floods, explosions, earthquakes, or other catastrophes, (4) epidemics, (5) quarantine restrictions, (6) strikes, (7) freight embargoes, (8) unusually severe weather, (9) inability of the Contractor to obtain equipment or material due to the operation of Governmental priorities, preferences, or allocations of equipment or material, or (10) delays of a subcontractor or supplier in furnishing material or supplies owing to causes beyond the control and without the fault or negligence of such subcontractor or supplier, including but not restricted to the foregoing enumerated causes, unless the Contractor could have procured the materials or supplies from other sources. In the event that a Default Notice of Termination has been delivered to the Contractor and it thereafter is determined that the default or failure is due to causes beyond the control and without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, effective as of the effective date of the Default Notice of Termination, pur *348 suant to Section 24 entitled “Termination at the Option of the Government.” The Government shall in case of such determination promptly cancel the notice under this Section and shall issue the notice provided for in paragraph (a) of Section 24 entitled “Termination at the Option of the Government”; and the rights and obligations of the parties shall in such event be governed by the latter Section.
11. Section 24 of contract NOrd-7426 provided as follows:
Section 24. Termination at the option of the Government. — (a) The performance of work under this contract may be terminated by the Government in accordance with this Section in whole, or from time to time, in part, whenever the contracting officer shall determine any such termination is for the best interests of the Government. Termination of work hereunder shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective. If termination of work under this contract is simultaneous with, a part of, or in connection with, a general termination (1) of all or substantially all of a group or class of contracts made by the Navy Department for the same product or for closely related products, or (2) of war contracts at, about the time of, or following, the cessation of the present hostilities, or any major part thereof, such termination shall only be made in accordance with the provisions of this Section, unless the contracting officer finds that the Contractor is then in gross or wilful default under this contract.
(6) After receipt of a Notice of Termination and except as otherwise directed by the contracting officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Termination; (2) place no further orders or subcontracts for materials, services, or facilities except as may be necessary for completion of such portions of the work under the contract as may not be terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of any work terminated by the Notice of Termination; (4) assign to the Government, in the manner and to the extent directed by the contracting officer, all the right, title, and interest of the Contractor under the orders or subcontracts so terminated; (5) settle all claims arising out of such termination of orders and subcontracts with the ap *349 proval or ratification of the contracting officer to the extent that he may require, which approval or ratification shall be final for all the purposes of this Section; (6) transfer title and deliver to the Government in the manner, to the extent and at the times directed by the contracting officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other material produced as a part of, or acquired in respect of the performance of, the work terminated in the Notice of Termination, and (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government; (I) use its best efforts to sell in the manner, to the extent, at the time, and at the price or prices directed or authorized by the contracting officer, any property of the types referred to in subdivision (6) of this paragraph: Provided, however, That the Contractor (i) shall not be required to extend credit to any purchaser and (ii) may retain any such property at a price or prices approved by the contracting officer; (8) complete performance of such part of the work as shall not have been terminated by the Notice of Termination; and (9) take such action as may be necessary or as the contracting officer may direct for protection and preservation of the property, which is in the possession of the Contractor and in which the Government has or may acquire an interest.
(e) The Contractor and the contracting officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this Section, which amount or amounts may include a reasonable allowance for profit, and the Government shall pay the agreed amount or amounts. Nothing in paragraph (d) of this Section prescribing the amount to be paid to the Contractor in the event of failure of the Contractor and the contracting officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Section shall be deemed to limit, restrict or otherwise determine or affect the amount or amounts which may be agreed upon to be paid to the Contractor pursuant to this paragraph (c)•
v {d) In the event of the failure of the Contractor and contracting officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this Section, the Government, but without duplication of any *350 amounts agreed upon in accordance with paragraph, (e), shall pay to the Contractor the following amounts:
(1) For completed articles delivered to and accepted by the Government (or sold or retained as provided in paragraph (5) (7) above) and not theretofore paid for, forthwith a sum equivalent to the aggregate price for such articles computed in accordance with the price or prices specified in the contract;
_(2) In respect of the contract work terminated as permitted by this Section, the total (without duplication of any items) of (i) the cost of such work exclusive of any cost attributable to articles paid or to be paid for under paragraph (d) (1) hereof; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders as provided in paragraph (5) (5) above, exclusive of the amounts paid or payable on account of supplies or materials delivered or services furnished by the subcontractor prior to the effective date of the notice of termination of work under this contract, which amounts shall be included in the cost on account of which payment is made under subdivision (i) above; and (iii) a sum equal to 2 percent of the part of the amount determined under subdivision
(1) which represents the cost of articles or materials not processed by the Contractor, plus a sum equal to 8 percent of the remainder of such amount, but the aggregate of such sums shall not exceed 6 percent of the whole of the amount determined under subdivision (i), which for the purpose of this subdivision (iii) shall exclude any charges on borrowings:
(3) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (b) (9) hereof; and any other reasonable cost incidental to termination of work under this contract, including expense incidental to the determination of the amount due to the Contractor as the result of the termination of work under this contract.
The total sum to be paid to the Contractor under subdivisions (1) and (2) of this paragraph {d) shall not exceed the total contract price reduced by the amount of payments otherwise made and by the contract price of work not terminated. Except for normal spoilage and to the extent that the Government shall have otherwise expressly assumed the risk of loss, there shall be excluded from the amounts payable to the Contractor as provided in paragraph (d) (1) and paragraph (d)
(2) (i), all amounts allocable to or payable in respect of property, which is destroyed, lost, stolen or damaged *351 so as to become undeliverable prior to the transfer of title to the Government or to a buyer pursuant to paragraph (5) (7) or prior to the 60th day after delivery to the Government of an inventory covering such property, whichever shall first occur.
(e) The obligation of the Government to make any payments under this Section: (1) shall be subject to deductions in respect of (i) all unliquidated partial or progress payments, payments on account theretofore made to the Contractor and unliquidated advance payments, (ii)’ any claim which the Government may have against the Contractor in connection with this contract, and (iii) the price agreed upon or the proceeds of sale of any materials, supplies or other things retained by the Contractor or sold, and not otherwise recovered by or credited to the Government, and (2) in the discretion of the contracting officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order shall have been terminated as provided in paragraph (5) (3) except to the extent that such claim covers (i) property or materials delivered to the Contractor or (ii) services to the Contractor in connection with the production of completed articles under this contract.
(/) In the event that, prior to the determination of the final amount to be paid to the Contractor as in this Section provided, the Contractor shall file with the contracting officer a request in writing that an equitable adjustment should be made in the price or prices specified in the contract for the work not terminated by the Notice of Termination, the appropriate fair and reasonable adjustment shall be made in such price or prices.
(g) The Government shall make partial payments and payments on account, from time to time, of the amounts to which the Contractor shall be entitled under this Section, whether determined by agreement or otherwise, whenever in the opinion of the contracting officer the aggregate of such payments shall be within the amount to which the Contractor will be entitled hereunder.
(h) For the purposes of paragraphs (d) (2) and (d) (3) hereof, the amounts of the payments to be made by the Government to the Contractor shall be determined in accordance with the Statement of Principles for Determination of Costs upon Termination of Government Fixed Price Supply Contracts approved by the Joint Contract Termination Board, December 31, 1948. The Contractor for a period of 3 years after final settlement *352 under the contract shall make available to the Government at all reasonable times at the office of the Contractor all of its books, records, documents, and other evidence bearing on the costs and expenses of the Contractor under the contract and in respect of the termination of work thereunder.
12. The issue under this Item 1 of the contract is whether the termination of the contract, was pursuant to section 23 or to section 24, with or without special qualifying conditions.
13. Section 14, “Disputes”, of said contract NOrd-7426, provides:
Section 14. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting' officer, subject to written appeal by the Contractor within 30 days to the Secretary of the Navy, whose decision shall be final and conclusive. Pending decision, the Contractor shall diligently proceed with performance.
14. On July 13,1945, the Government by telegram notified the contractor that said contract NOrd-7426 was thereby partially terminated by eliminating 396,000 of the rocket bodies covered under Item 1 thereof; that immediately all work should stop, subcontracts be terminated and no further orders placed except to the extent necessary to perform the portion thereof not thereby terminated or to the extent that the contractor or the subcontractor might wish to retain and continue for any account any work in process or other materials ; that telegrams containing similar instructions to all subcontractors and suppliers should be sent; that if said termination should result in release of labor, facilities or pro--duction tools, the contractor was requested to notify the Cognizant Navy Material Inspector immediately and cooperate with him in arranging meetings with the War Production Board and War Manpower Commission, and that letter and instructions followed.
15. By letter of August 3,1945, the Chief of the Bureau of Ordnance, and contracting officer for the Navy Department, wrote the contractor, in part, as follows:
*353 1. Effective Date of Termination: You are hereby notified that the subject contract is. terminated for the convenience of the Government to the extent, and effective at the date, set forth in Exhibit A attached hereto.
# % % sfs
6. Submission of Settlement Proposal: (a) The Government desires to settle your termination claim by negotiation and on such terms as will speedily and fairly compensate you therefor. To assist you in prompt submission of your settlement proposal, there is enclosed one set of the Standard Forms of the Ofiice of Contract Settlement.
* * * í* *
9. Please acknowledge receipt of this Notice and indicate intent to file or not to file a claim, as shown below.
The form of acknowledgment, constituting a part of the above notice, was executed August 6, 1945, by G. B. McDowell, Jr., as Treasurer of Union Industries, Inc., Canons-burg Steel & Iron Works Division, stating its intent to file a termination claim, and that two signed copies thereof were being returned.
16. Exhibit A attached to the notice of August 3, 1945, provided that contract NOrd-7426 was terminated to the extent of 395,336 of the 400,000 rocket bodies required therein, leaving 4,664 rocket bodies, which had been completed at that time; that termination was effective immediately upon receipt of the Naval message of July 13, 1945, and that this notice constituted a modification and confirmation of such Naval message.
17. There were enclosed with the notice of August 3,1945, certain forms and instructions, including a copy of Instructions to Prime Contractors Under Terminated Fixed-price (lump sum) Supply or Construction Contracts. These instructions provided in part:
Section 1
2. Termination Procedure Policy. — It is the policy .of the Government, wherever possible, to settle termination claims by negotiation. Negotiated settlements must, however, be supported by adequate data, and the prompt submission of properly supported settlement proposals will facilitate speedy and equitable final settlements.
*354 Section 3
11. /Submission of Proposal and Supporting Papers.— Work on your Settlement Proposal should be begun promptly after receipt of your Notice of Termination. Unless otherwise authorized by the Contracting Officer, you should submit your proposal on the appropriate Standard Forms of the Office of Contract Settlement * * *.
(b) Elements of Tour Claim and Methods of Submission. — As a rule, your Settlement Proposal will consist of (1) your costs and profit allocable to the terminated portion of the Contract, (2) your post-termination or settlement expenses, and (3) the charges of your subcontractors. Normally your Proposal, when submitted, should be complete and cover all elements of your claim. In order to expedite settlement, however, you may submit interim proposals covering either (1) all your own costs or (2) your post-termination or settlement expenses or (3) settlements with subcontractors.
Section 4
15. Transfer of Termination Inventory and Subcontracts to Continuing War Contracts. — * * *
(b) _ Reimbursement of Costs. — In the case of termination inventory so transferred, you will be reimbursed for its cost upon settlement of either the terminated contract or the continuing contract, if later • terminated. * * *
Section 8
22. Partial Payments. — Partial payments may be made to you, pending the settlement of your termination claim, by either (1) am, immediate partial payment before you have had an opportunity to prepare an adequate inventory or statement of costs, or (2) a cost-supported partial payment as promptly as possible after submission of a partial or complete settlement proposal with the prescribed supporting data. * * *
18. On July 25,1945, the contractor submitted an application for partial payment, requesting a partial payment of $25,000, which was approved and paid on the same day. This application contained a note reading:
In the preparation of this application and in order to facilitate its handling only those charges of a direct nature possible of immediate ascertainment have been included. Such other charges as might apply in the *355 nature of work in process, General and Administrative Expenses or settlement expenses, will be reflected in subsequent applications or proposals filed. Amount shown as estimate for raw materials, purchased parts and supplies is net of inventory disposals made prior to date of application.
19. Thereafter the contractor submitted additional settlement proposals for partial payments on October 3, November 28, and December 21, 1945; February 8, and April 4, 1946. The final settlement proposal of April 4, 1946, contained a claim of $103,011.11 for its subcontractors and $338,235.49 for the prime contractor, totaling $441,246.60.
Payments were made in full for the subcontractors’ claims and payments were made for the prime contractor in the sum of $25,000 July 25; $42,000 on October 29, and $11,000 on November 28, 1945, which, together with disposal credits of $3,065.59, left a balance of $257,169.90 on the contractor’s final termination proposal.
20. On February 14, 1947, the Chief of Bureau of Ordnance, Navy Department, wrote the contractor in respect to its termination claim under contract NOrd-7426, pertinent parts of which read as follows:
* * * The contract delivery schedule called for 10,000 units to be delivered during December 1944,20,000 units during January 1945, 30,000 during February 1945 and to continue at the rate of 50,000 during each month thereafter until completion.
$ $ $ $ $
By Bureau of Ordnance letter of 25 March 1945 the Contractor was advised that its failure to perform satisfactorily under Contract NOrd-7426 (and Contract NOrd-5923) was attributable particularly to (1) lack of qualified management, (2) lack of a definite managerial policy, (3) lack of a constructive labor program, (4) lack of a competent inspection department and inspection procedure, including adequate gauge setting and checking facilities, and (5) lack of proper maintenance. By Bureau of Ordnance letter of 8 June 1945, Contractor was reminded that only approximately 2,000 Pocket Heads, Mark 6, had been delivered under the contract and that this production rate was unsatisfactory. As a concession to the Contractor a revised minimum production schedule was set up under Contract NOrd-7426 calling for the delivery of 15,000 units in *356 June, 30,000 units in July and 30,000 units per month thereafter.
The recommendation was made in a memorandum written by Lt. D. D. Trimble (Pr9) that the contract be cancelled for default. This recommendation was made as the result of a survey conducted by Lt. Trimble at Contractor’s plant. The Bureau gave serious consideration to this recommendation at the time the conference was held on 27 June 1945 in the Bureau.
❖ ❖ :Je * ❖
At a conference held in the Bureau of Ordnance, Washington, D. C., on or about 27 June 1945, an agreement was reached with the Contractor whereby the contract would not be terminated for default but would be terminated for the convenience of the Government upon the express understanding that the Contractor would only be permitted to submit in his termination claim (1) Tooling costs, and (2) his inventory of existing special material. The Bureau of Ordnance has determined that, in accordance with the terms of this Agreement, the net sum due and payable to the Contractor on his termination claim is $3,704.95. * * * Subsequent to the meeting this understanding was confirmed by Bureau of Ordnance letter dated 3 July 1945. On 10 July 1945 the cognizant section of the Bureau of Ordnance requested that the contract be terminated for the convenience of the Government in accordance with Bureau of Ordnance letter dated 3 July 1945. On 3 August 1945 the Bureau of Ordnance issued Change Letter No. 2 terminating Contract NOrd-7426 for the convenience of the Government. Unfortunately, by inadvertence, this change letter did not recite the fact that its issuance by the Government was conditioned on the Contractor’s approval of the agreement reached during the conference 27 June 1945. * * *
In view of the foregoing and since the Notice of Termination for the convenience of the Government was offered to the Contractor only providing that the terms of the agreement reached during the June 1945 conference were approved by the Board of Directors of the Contractor, the Bureau of Ordnance hereby withdraws its Notice of Termination for the convenience of the Government and in lieu thereof terminates the contract as of the 3rd day of August 1945 for default pursuant to the terms of the contract.
21. On December 29, 1950, the Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals, *357 issued a report of its findings and decision, holding that the contractor’s termination claim be limited to recovery of certain items of cost in accordance with an oral agreement with representatives of the Bureau of Ordnance at a conference on June 27, 1945.
22. The Board’s report of its findings of fact and decision, reads, in part as follows:
4. In the latter part of May or the early part of June, 1945, Appellant’s representatives were called to Washington by the Bureau of Ordnance to attend a conference concerning its contract performance. Appellant was represented at the conference by its president, and by its vice-president. [R. Green Annan and John E. McKelvy] During the conference Appellant’s representatives were formally advised that in view of their company’s continued default in the performance of contract NOrd-7426 the Bureau of Ordnance had decided to terminate the contract for default, and the attention of Appellant’s representatives was directed to the fact that under such a termination their company would be reimbursed only for special tooling, for such special inventory as was in acceptable condition for diversion to the manufacture of projectiles or to other rocket manufacturers, and, if they passed inspection, for rocket bodies which were then in process in various stages of completion. * * *
5. Subsequent to the conference discussed in the preceding paragraph, and before any formal written notice of termination had been issued, the Bureau was advised that Appellant’s president had sold his interest in the corporation and that a new management had assumed control. As a result of that information, a further conference was held in Washington on 27 June 1945. Appellant’s representatives at the conference included Alfred Sachs and J. G. Murray, Jr. The evidence before the Board indicates that Sachs was one of three individuals who owned the stock of Globe Corporation, which had been organized in June 1945 for the purpose of acquiring and which, by about 15 June 1945, had acquired substantially all of the stock of Union Industries, Inc. Sachs was also the president of Manufacturers Trading Corporation, described as a financing institution located in Cleveland, Ohio, and (together with his family) owned the major stock interest in that com-gany. One of the other two owners of the stock of the ;lobe Company was also the owner of the entire stock *358 of Continental Industries, of which J. G. Murray, Jr., was vice-president. On or about 15 June 1945 Union Industries, Inc. engaged Continental Industries to manage and operate Union Industries, Inc. with Manufacturers Trading Corporation furnishing the finances necessary for its operations. Murray, vice-president. of Continental Industries, was placed in charge of Union Industries. As concerns any particular titles he may have had, the evidence shows that as early as October 1945 Murray was signing various documents as Appellant’s president.
* * * * *
7. What transpired at the conference of 27 June 1945 is a matter which has been a subject of considerable dis-Eute between the parties. On all the evidence the Board nds that at the conference on 27 June 1945 representatives of the Bureau of Ordnance advised the representatives of Appellant’s new management of the nature of the proceedings at the earlier conference mentioned above, of the fact that the processing of a formal written notice of termination for default had already been commenced in the Bureau of Ordnance, and of the fact that under a termination for default Appellant would be reimbursed only for special tooling, for such special inventory as was in acceptable condition for diversion to the manufacture of projectiles or to other rocket manufacturers, and, if they passed inspection, for those rocket bodies which as of the date of the earlier conference were in process; that Appellant’s representatives in turn indicated their feeling that the Bureau would not be unjustified in terminating Appellant for default but that in view of the fact that new management had taken over Appellant it would be highly desirable from the standpoint of the new management if the Bureau could accomplish the same result without Appellant and its new management incurring the stigma of an official termination for default; that after considerable discussion of the matter Appellant’s representatives and the representatives of the Bureau agreed that in lieu of being terminated for default NOrd-7426 would be terminated for the convenience of the Government and that Appellant’s reimbursement for such termination would consist of such reimbursement as had been outlined by the Bureau representatives during the meeting as the reimbursement to which Appellant would be entitled if the contract were terminated for default; that it was also understood by representatives of both parties that the formality of obtaining the approval of Appellant’s *359 board of directors would be necessary. Appellant’s contentions as to what transpired at the conference are discussed below in the Decision.
23. Paragraph 8 of the Board’s report of its findings of fact and decision, quoted a letter of date July 2, 1945, by James G. Murray, Jr., vice president of Continental Industries, Inc., to the Bureau of Ordnance, U. S. Navy Department, which read, in part:
As you were advised on Wednesday, June 27th, this organization was engaged as of June 15,1945, as operations supervisors for the Division of Union Industries, Inc., including Canonsburg Steel & Iron Works.
You have a contract, NOrd 7426 (Negotiated Contracts 5" rocket bodies, Mark 6, Mod. 0), with the Can-onsburg Steel & Iron Works, which contract, as to its status when we were engaged as operations supervisors, was found (1) not up to schedule on deliveries, and (2) in process of a contemplated cut-back, or reduction, as to quantities desired by you.
The intent of your Department to reduce the quantities was not made known to us until the meeting of the 27th..
Prior to such meeting we had caused to be made engineering surveys with a view towards fulfilling the terms of the contract to the best of our ability, and irrespective of cost.
A study of the contemplated cut-back leads us to the conclusion that it may be to the best interests of all parties concerned (as you seemed to indicate at the meeting of the 27th) were the entire contract terminated on a basis mutually satisfactory, and our efforts concentrated upon the projectile contract, and possible extension thereof.
Accordingly, without prejudice to Union Industries, Inc., existing rights, and subject to approval of Union Industries, Inc. Board of Directors of the terms of a termination settlement to be agreed upon, we propose:
1. That effective at once, except for completion of rockets now in process, all work on the above numbered contract cease.
2. That termination be effected on the basis of inventorying all tooling costs and existing special material, if any, within the rules and regulations applicable to terminations in general.
3. That your Department make an advance to Union Industries, Inc. against such termination costs on esti *360 mated charges for tools and inventories to be delivered to you.
It is our intent, in the event that such a termination is agreed upon, to use the funds resulting therefrom to liquidate all existing liabilities pertaining to the items to be delivered to your Department.
We have arranged for a special group to take inventories and to compile all of the usual documents required in connection with the suggested termination, promptly upon receipt of your instructions.
* * * * *
24. Under paragraph 9 of the Board’s report of its findings of fact and decision, the reply of the Chief of the Bureau of Ordnance (July 3, 1945) to Murray’s letter was quoted as follows:
Subject: Contract NOrd 7426, 5" Rocket Heads, Mark 6 Mod 0, Canonsburg Steel & Iron Works, Contractor — Termination for the convenience of the Government.
Reference: (a) Continental Industries, Inc. ltr. to BuOrd dtd 2 July 1945.
The Bureau of Ordnance acknowledges the receipt of reference (a), in which Continental Industries, Incorporated, managing the subject contract under a managing contract, agrees with the Bureau of Ordnance that it is to the best interest of all parties concerned to terminate the subject contract for the convenience'of the Government, and that the future efforts at the contractor’s plant be concentrated on the successful operation of the 5"/38 Projectile line.
It is understood that the managing company wishes to recommend this procedure to the Board of Directors for approval, and after receipt of this approval, will notify the Bureau of Ordnance, whereupon termination for the convenience of the Government will be instituted.
After termination proceedings have been started, the Bureau of Ordnance will entertain a request for partial payments against such termination costs within the rules and regulations applicable under such conditions.
25. The Board further reported as a finding of fact:
10. On all the evidence the Board finds that Murray’s letter of 2 July 1945 was reasonably understood by the Bureau of Ordnance, under the circumstances described above, as being a letter confirming the agreement reached on 27 June 1945, and that the Bureau’s response was forwarded in accordance with that understanding.
*361 11. The Board finds on all tbe evidence that shortly thereafter the Burean of Ordnance was advised by telephone by Murray that Appellant’s board of directors had approved the agreement here found by the Board to have been reached during the conference on 27 June 1945. * * *
$
Contract NOrd-5923, which called for the delivery of 5"/38 AAC projectiles, referred to in the foregoing letters, was also terminated by the (Government August 14, 1945. (Finding 67).
26. The Board’s decision, as reported in its findings of fact and decision, dated December 29,1950, read in part:
20. At the request of counsel for both parties the present decision of the Board is concerned with the issue as to whether the subject contract has been terminated for default, or for the convenience of the Government, or for the convenience of the Government subject to an oral agreement limiting the amount of Appellant’s termination claim.
21. The Board finds that the Government agreed to terminate the contract for the convenience of the Government rather than for default in consideration of Appellant’s agreement that the termination costs to be paid Appellant by the Government were to consist solely of payments for special tooling, certain special inventory, and, if they passed inspection, certain rocket bodies which were then in process in various stages of completion.
27. It has been stipulated by the parties that if a recovery is to be had by the plaintiff on the basis of a limited agreement for a termination claim, the plaintiff is entitled to recover $8,879.83, and that if the plaintiff is entitled to recover on the ground of termination for the convenience of the Government, without any limiting agreement as to the amount of the recovery, then plaintiff is entitled to recover $113,417.
Case No. J¡3884. (Contract NOrd-71$6 — Item No. £)
28. By the decision of the Court of Claims in this cause, duly made on July 15, 1952, the plaintiff has a judgment against the Government in the amount of $63,000, subject only to the right of the Government to offer evidence in *362 support of its Second, Third, Fourth, Fifth, Sixth and Seventh Counterclaims.

Case No. 48867 (Contract UNR-TPs-m6)

29. John A. Hadden, the duly appointed, qualified and acting Trustee in Bankruptcy, has been duly substituted as party plaintiff herein.
30. On November 9, 1943, forty-four separate nations, including the United States, entered into an agreement or instrument in writing (hereinafter called the Agreement), the purpose and effect of which was to create and establish the United Nations Eelief & Eehabilitation Administration (hereinafter called UNEEA).
31. By the terms of the Agreement, UNEEA was created to supply food, clothing, shelter, medicine and other necessities of life to people liberated from the Axis powers and to help them produce by their own efforts such articles as were necessary for relief.
32. By the terms of the Agreement, UNEEA was given the power to acquire, hold and convey property, to enter into contracts and undertake obligations, to designate or create agencies and to review the activities of agencies so created, to manage undertakings and in general to perform any legal act appropriate to its objects and purposes.
33. The objects and purposes of UNEEA as set forth in the Agreement included the following: To plan and arrange for the relief of victims of war in any area under the control of any of the United Nations by providing food, fuel, clothing, shelter, medicine and other necessities and services; to formulate measures for the coordination of purchasing and transportation so to to integrate the activities of UNEEA in the distribution of supplies.
34. The policy-making body of UNEEA, as created by the Agreement, was the “Council,” which consisted of one representative of each member government.
35. The executive authority of UNEEA was, by the Agreement, vested in the Director General appointed by the Council upon the nomination by unanimous vote of the “Central Committee” which consisted of representatives of China, U. S. S. E., the United Kingdom and the United States.
*363 36. In prescribing the duties of the Director General, the Agreement provided as follows:
* * * In arranging for the procurement, transportation, and distribution of supplies and services, he and his representatives shall consult and collaborate with the appropriate authorities of the United Nations and shall, whenever practicable, use the facilities made available by such authorities. * * *
37. It was provided by the Agreement that each member government, insofar as its appropriate constitutional bodies should authorize, should contribute to the support of UNKKA in order to accomplish the purposes of providing and distributing food, clothing, shelter, medicine and other supplies and services.
38. It was provided by the Agreement that the Administrative expenses should be allocated to the members in proportions to be determined by the Council.
39. At the first session of UNBBA held at Atlantic City, New Jersey, from November 10, 1943, to December 1, 1943, the Council of UNRKA duly adopted the following resolution:
In order that the supplies allocated by the appropriate inter-governmental agency against requirements presented and supported by the administration may be procured expeditiously and without duplication of effort, the Director General, after consultation, where necessary, with appropriate inter-governmental agency, will make use wherever possible of the established national agencies concerned with the procurement, handling, storage and transport of supplies. The member governments to which such national agencies are responsible would agree on their part to put the services of such agencies at the disposal of the administration. Such additional responsibilities would form part of those already undertaken in prosecuting the war effort of the United Nations.
49. On or after December 13, 1945, Amsler-Morton Division of Union Industries, Inc. (hereinafter referred to as Amsler-Morton), received a letter from UNRBA dated December 13,1945, stating:
For budgetary and planning purposes, we would be pleased to receive at your earliest convenience provi *364 sional quotation, terms, delivery schedule, etc., on the following equipment, boxed for export:
4 only Complete high speed lines (excepting furnaces) for making wide-mouth glass jars.
41. Under date of December 18,1945, Amsler-Morton addressed a letter to UNKRA as follows :
Thanks for your inquiry of December 13 regarding a plant for making wide mouth glass jars.
We note that you except the furnaces, in which we are much interested, and would like to quote on them as well as the remainder of the equipment needed.
We design and furnish complete equipment for glass plants and you may be interested in knowing that one automatic machine and all its correlated equipment, including furnaces, will make 9,000,000 wide mouth glass jars per 300 day year; and we suppose that by 4 complete high speed lines you mean 4 automatic machines.
We enclose, herewith, our catalogs for your further information and will be glad to give you the data required just as soon as we hear from you.
42. Under date of March 5,1946, Amsler-Morton addressed a further letter to UNRRA as follows:
On December 18, 1945 we wrote you regarding your inquiry of December 13, 1945, covering four (4) high speed lines for making wide-mouth glass containers.
_ If this project is still under consideration we would like to submit our quotation covering the complete plant, including all furnaces and auxiliary equipment.
We are now designing and furnishing the equipment for a complete container plant for export and would be in position to serve you promptly.
43. Under date of February 15, 1946, UNRRA addressed to the Government of the United States its requisition No. UA-1664, specifying that UNRRA funds will be used, describing glass manufacturing machinery, food jars (wide mouth) together with detailed specifications and including the following, in substance:
(1) Total estimated net weight 400,000 pounds. Total estimated value $335,015 — civilian use.
(2) Delivery desired — as soon as possible.
(3) Procurement agency — Treasury Department, Procurement Division.
*365 (4) Source of Funds: It is understood that UNERA undertakes to accept the above supplies subject to compliance with specifications and that upon delivery to UNERA the total cost of such supplies is to be considered part of the contribution of the United States government to UNERA.
(5) End Use: For Civilian Relief by UNERA in Liberated Areas. This equipment forms part of the program of relief supplies for the Ukraine and Byelorussia which has already been approved by this Administration. Three sets are for the Ukraine and two sets for Byelorussia. These conveyor lines, feeders and accessories are to replace similar equipment destroyed by enemy action and to rehabilitate glass jar making plants of which only the furnaces remain. These jars will be used for the preservation and distribution of foods considered essential for civilian relief. Delivery by the supplier can be made in approximately eight months and put into use in approximately four months after shipment from the U. S., which will satisfy the purpose for which the equipment is required.
Page 4 of this requisition (also entitled “request to supply”) contained the following notation:
Due to similar equipment now in use in Ukrainian and Byelorussian S. S. R. for which service facilities, as well as skilled help, is_ available, it is suggested that equipment on this requisition be purchased from Frazier-Simplex, Inc., Washington, Pennsylvania.
44. By its “Commitment Letter No. 467” dated March 1, 1946, the Department of State of the United States designated the Treasury Department as authority to procure the supplies described in UNRRA’s request No. UA-1664 and to charge the cost thereof to the program allocation indicated in column 4 of the letter. Column 4 simply indicates two capital letters X whose significance does not further appear. The letter also authorizes UNERA to export the materials covered by the letter.
45. Under date of April 4,1946, the Treasury Department, Procurement Division, pursuant to Requisition No. UA-1664, addressed a letter to Amsler-Morton requesting Amsler-Morton to furnish a quotation for glass manufacturing machinery as specified in said Requisition No. UA-1664.
*366 46. Under date of April 26, 1946, the Treasury Department, Procurement Division, addressed a letter to Amsler-Morton designated Commitment Letter Control No. 86, by which, pursuant to said Requisition No. UA-1664, the quotations of Amsler-Morton with respect to the supplies described in Requisition No. UA-1664 were accepted and Amsler-Morton was authorized to proceed with the manufacture of said supplies under contract UNR-TPs-2786, copies of which would thereafter be submitted for signature.
47. On or about August 9,1946, the Treasury Department, Procurement Division, addressed to Amsler-Morton a further letter by which a copy of the executed Contract No. UNR-TPs-2786 entered into pursuant to Requisition No. UA-1664 was transmitted.
48. Contract UNR-TPs-2786, United States Treasury Department, Procurement Division, Form No. 818, was executed by the contractor August 5, 1946, and accepted by the Government August 8, 1946. It provided for the manufacture and delivery of glass-making machinery and spare parts in accordance with the general description and specifications therein contained and expressly referred to as “Req. No. UA-1664 (Final) Committed in letter of April 26, 1946,” at a contract price of $248,375.
49. The Congress of the United States authorized United States participation in UNRRA under Public Law 267, approved March 28, 1944, 58 Stat. 122, and Public Law 262, approved December 18, 1945, 59 Stat. 612. During the years 1944, 1945, and 1946 the Congress passed the following appropriations for UNRRA purposes: Public Law 382, approved June 30, 1944, 58 Stat. 629; Public Law 259, approved December 14, 1945, 59 Stat. 609; Public Law 269, approved December 28, 1945, 59 Stat. 632, 634; Public Law 391, known as “Second Supplemental Appropriation Rescission Act, 1946,” approved May 27, 1946, 60 Stat. 221, 228; and Public Law 521, approved July 23, 1946, 60 Stat. 600, 603.
50. On or about September 27, 1945, by Executive Order No. 9630, the President of the United States transferred to the State Department the functions of the Foreign Economic Administration with respect to the participation by the *367 United States in the UNBBA program. These functions had been defined in Executive Order No. 9453 which read in part as follows:
* * * the Administrator of the Foreign Economic Administration is authorized and directed to exercise and perform, through any Executive department, independent establishment, or agency, all the functions and authority with respect to the expenditure of funds, and the provision of supplies and services related thereto, vested in the President by Public Law 267, approved March 28, 1944, and the United Nations Belief and Behabilitation Administration Participation Appropriation Act, 1945.
51. On November 26, 1946, Amsler-Morton duly assigned to Manufacturers Trading Corporation all of the sums due or to become due under said contract UNB-TPs-2786, and thereafter Manufacturers Trading Corporation duly served notice of said assignment upon all divisions and persons necessary in order to comply with the Assignment of Claims Act.
52. The following sums were paid by Manufacturers Trading Corporation to or for the account of Union Industries, Inc. on the strength of the assignment for Union Industries of all sums due and to become due under said contract UNB-TPs-2786:
November 26, 1946_$110,000
December 24, 1946_ 8, 000
December 31, 1946_ 30, 000
January 2, 1947_ 100, 000
53. On or about February 20, 1947, the Treasury Department duly issued its public voucher for purchases and services other than personal to Manufacturers Trading Corporation, assignee of Amsler-Morton Division of Union Industries, Inc., in the amount of $248,375 in respect of the performance by Amsler-Morton of said contract UNB-TPs-2786 pursuant to said Bequisition No. UA-1664.
54. Said voucher contained: (1) the certificate of the authorized certifying officer to the effect that the supplies described in said contract UNB-TPs-2786 were received in good condition after due inspection, acceptance, and delivery *368 prior to payment as required by law; that they were procured under contract UNE-TPs-2786 pursuant to Eequisition No. UA-1664 and that the prices charged were just and reasonable and in accordance with the agreement. (2) The designation of the appropriation “20-114/70009 (25),” under the appropriation title of “United Nations Eelief & Eehabilitation Administration (Allotment to Treasurer, Federal Supply) 1944-1947” and (3) The allotment symbol of UA-1664.
55. The aforesaid voucher was forwarded to the General Accounting Office by Treasury Department letter dated February 24,1947, with a request that the funds represented thereby be withheld. This letter stated in part:
The voucher is forwarded to you for withholding of the funds represented thereby, to the credit of the Bureau of Supplies and Accounts, Navy Department, in accordance with copies of the attached directives dated February 7 and February 12, 1947 from the Navy Department and Mr. J. E. Furnas, Liaison Agent of the Treasury Department, Price Adjustment Board, respectively. A copy of a letter dated February 8, 1947 from the assignee and two copies of the Notice of Assignment dated January 6,1947 are also attached.
Appropriation 20-114/70009 (25), United Nations Ee-lief and Eehabilitation Administration (Allotment to Treasury, Federal Supply) 944-1947 is chargeable with the approved amount or the voucher.
Please furnish the Navy Department and this Bureau with copies of the certificate of settlement.
No part of the voucher for $248,375 has been paid to the assignee, plaintiff herein, nor to Union Industries, Inc., for the performance of the contract.
56. When Manufacturers Trading Corporation made its loan to Union Industries on the strength of the assignment of the proceeds of the UNEEA contract, the assignee knew that the UNEEA contract contained no anti-setoff clause similar to that contained in other Government contracts performed by Union (finding 6). The assignee was cognizant of the fact that supplies to be manufactured were UNEEA supplies and that payment would be made from UNEEA funds segregated and held by the United States Treasury Department.

*369
Case No. l¡13-5% (Overassessment of taxes)

57. On or about July 23, 1951, plaintiff received from the Commissioner of Internal Revenue, Treasury Department, United States of America, the following certificates of over-assessment respecting bankrupt’s taxable years ending December 31,1945, December 31,1946, and December 31,1947:
(a) Certificate of Overassessment for the taxable year ended December 31,1945, showing an overassessment of income taxes for said year in the sum of $123,811.82 and a refund due plaintiff in said sum of $36,097.10, plus interest thereon.
(b) Certificate of Overassessment for the taxable year ended December 31,1945, showing an overassessment of income taxes for said year in the sum of $123,811.82 and a refund due plaintiff in said sum of $123,811.82, plus interest thereon.
(c) Certificate of Overassessment for the taxable year ended December 31, 1945, showing an overassement of income taxes for said year in the sum of $95,156.91, and a refund due plaintiff in the sum of $71,367.69, plus interest thereon.
58. Manufacturers Trading Corporation made the following payments for the taxable year ending December 31,1945:
March 15, 1946_$18,048.53
June 15, 1946_ 18,048.53
September 15, 1946_ 18, 048. 52
December 15,1946_ 18,048.52
Total_ 72,194.10
Defendant concedes that plaintiff is entitled to a refund for the year ending December 31, 1945, of $36,097.10, together with interest on $18,048.58 at the rate of 6 percent from September 15, 1946, and interest on $18,048.52 at the same rate from December 15,1946.
59.Manufacturers Trading Corporation made the following payments for the taxable year ending December 13, 1946:
March 15, 1947_$30,952.96
June 9,1947_ 30,952.98
September 8, 1947_ 30,952.95
December 5, 1947_ 30,952.95
Total. 123,811.82
*370 Defendant concedes tbat plaintiff is entitled to a refund for the taxable year ending December 31, 1946, of $123,-811.82, together with interest at the rate of 6 percent from the respective dates and upon the respective amounts paid, as above^
60.Manufacturers Trading Corporation made the following payments for the taxable year ending December 31, 1947:
March 15, 1948_?23, 789. 23
June 11, 1948_ 23,789.23
September 13, 1948_ 23,789.23
Total_ 71, 367. 69
Defendant concedes that plaintiff is entitled to a refund for the taxable year ending December 31,1947, of $71,367.69, together with interest at the rate of 6 percent from the respective dates and upon the respective amounts paid, as above.
61. The overpayments of taxes total $231,276.61. Demand for payment of the foregoing refunds due plaintiff, pursuant to said certificate of overassessment, has been made by plaintiff but payment has been refused by the defendant.
Summary
62. Additional termination costs of Union Industries, Inc., as a result of the termination of contract NOrd-7624, were $113,417, but if recovery is had upon a limitation agreement as determined by the contracting officer and sustained by the Armed Forces Board of Contract Appeals, the plaintiff’s recovery would be limited to $8,879.83 (finding 27).
By the decision of the Court of Claims July 15, 1952, the plaintiff has judgment for the sum of $63,000 under item 2 of the same contract (finding 28).
There remains unpaid the sum of $248,375 for the performance by Union Industries, Inc. of contract UNR-TPs-2786 (finding 55).
Upon certificate of overassessment of taxes on income for the calendar years 1945, 1946, and 1947, the defendant concedes that the plaintiff is entitled to recover the sum of *371 $231,276.61, with interest thereon as indicated in findings 58, 59, and 60 herein.
Each of the foregoing sums may be subject to offset by defendant’s counterclaims as set forth in the following findings, depending upon the decision to be rendered by the court.
Defendant’s Counterclaims
63. On May 21, 1947, Union Industries, Inc., entered into a stipulation in regard to the renegotiation indebtedness of Amsler-Morton Company (arising out of Navy contract NOD-6899) and Pennsylvania Industrial Engineers, Inc. (arising out of Navy contract NOD-6898), said companies being divisions of Union Industries, Inc.
By this stipulation Union Industries, Inc., agreed to pay to defendant $18,847.02, with interest at the rate of 6 percent from May 21, 1947, the payments to apply first to accrued interest and the balance to the principal sum. Union has since paid to defendant $18,927.74, including interest, leaving a balance of $1,085.15, with interest thereon from July 15,1948.
64. After due notice to Union Industries, Inc., and in compliance with the Kenegotiation Act, as amended, 50 App. U. S. C. 1191, proceedings were conducted by representatives of the Navy Price Adjustment Board and said contractor to determine the amount of excessive profits realized for the fiscal year ended December 31,1944, under contracts other than those under which plaintiff’s claims are predicated, between the various operating divisions of Union and the Government.
On or about September 27, 1945, the Navy Price Adjustment Board unilaterally determined that the profits earned during the year 1944 by the Amsler-Morton Division of Union Industries, Inc., represented excessive profits payable to the Government in the net sum of $140,553. About two years later a copy of this determination was sent to Union by registered mail, on or about September 25, 1947.
On or about November 25, 1947, the War Contracts Price Adjustment Board, reviewed said determination and unilaterally determined that $140,553 represented excessive profits earned by the Amsler-Morton Company, an operating *372 division of Union Industries, Inc., during the year ended December 31,1944. A copy of said unilateral determination and order for payment was duly sent to Union by registered mail, on or about November 25, 1947. No part of the said sum of $140,553 has been paid to the Government.
The defendant also claims interest thereon from December 10,1947.
65. The United States has unpaid claims against Union in the amounts of $2,366.29 and $25,334.67 by reason of income and excess profits taxes for the fiscal year ending July 31,1944, duly assessed by the Commissioner of Internal Revenue January 23, 1945, against the Canonsburg Steel & Iron Works, which was merged with Union as of the close of business January 31, 1944. The sum of $27,700.96 remains due from Union Industries, Inc., with interest thereon as provided by law.
66. The United States has unpaid claims against Union in the amount of $1,840,826.67, plus interest thereon as provided by law, by reason of income and excess profits taxes and interest assessed by the Commissioner of Internal Revenue January 30,1951, as follows:
Excess profits tax and interest of $138,332.16, for period August 1,1943 to January 31,1944, assessed against the Canonsburg Steel & Iron Works, and Union Industries, Inc., transferee of Canonsburg Steel & Iron Works, January 31,1951.
Excess profits tax and interest of $1,695,769.88, for the period January 1, 1944 to May 5, 1944, assessed against Union Industries, Inc., transferee of the Amsler-Morton Company, J anuary 31,1951.
Income tax and interest of $6,724.63, for the period J anuary 1, 1944 to May 5, 1944, assessed against Union Industries, Inc., transferee of the Amsler-Morton Co., January 31,1951.
67. On or about April 14, 1944, the Bureau of Ordnance, Navy Department, entered into contract NOrd-5923 with Canonsburg Steel & Iron Works for the manufacture of 750,000 5"/38 AAC projectiles for a total price of $6,675,000. Under the terms of the contract the contractor was required to furnish all materials for the projectiles. The contractor *373 was unable to procure the necessary materials and the Government furnished copper bands, shipping cases and some other supplies, without any change or supplemental agreement, but with the understanding that the contractor would reimburse the Government for them.
On or about August 31, 1944, Canonsburg Steel & Iron Works was liquidated and its assets were distributed to its sole stockholder, Union Mining Company of Allegheny County, a Maryland corporation. By Articles of Amendment March 14, 1945, the name of Union Mining Company of Allegheny County was changed to Union Industries, Inc. On or about April 14, 1945, the aforesaid contract was amended by substituting Union Industries, Inc., as the contractor in place of Canonsburg Steel & Iron Works.
The aforesaid contract NOrd-5923 was terminated by the Bureau of Ordnance by notice of August 14, 1945, effective August 16, 1945.
The value of materials and supplies furnished by the Government under the aforesaid contract was $507,706.91. No part of this sum was recouped by the defendant upon partial payment vouchers during 1944 or during 1945, and Union Industries, Inc., has made no payment thereon.
COUNTERCLAIM SUMMARY
68. By stipulation between counsel for Hadden and counsel for defendant it was agreed that Union Industries, Inc., is indebted to the United States in the total sum of $2,517,-872.69, consisting of $1,085.15 balance due under renegotiation of contract NOD 6899 with the Amsler-Morton Company and contract NOD 6898 with the Pennsylvania Industrial Engineers, Inc., $140,553 representing excessive profits of the Amsler-Morton Company for the year ending December 31,1944, $507,706.91 for materials and supplies furnished by the Government under contract NOrd-5923, and $1,868,-527.63 for income and excess profits tax assessments upon the income of Canonsburg Steel & Iron Works and Amsler-Morton Company prior to the merger of these companies with Union Industries, Inc., with interest thereon as provided by law.
*374 SUCCESSION" IN INTEREST
69. The defendant alleges that Manufacturers Trading Corporation became the successor in interest to the debts and obligations of Union Industries, Inc., as a result of the acts of its president, Alfred H. Sachs, and others, in acquiring the assets of Union for the benefit of Manufacturers, and to the detriment of the creditors of Union, and asks that the indebtedness of Union to the United States, as asserted in defendant’s counterclaims, be set off against any and all sums found to be due Manufacturers Trading Corporation.
The Court of Claims held in its decision of July 15, 1952, 123 Ct. Cls. 246, 255:
There are circumstances in which a transferee of assets will be held liable as a successor in interest for obligations of the transferor, e. g., where the transfer operates as a fraud on the creditors of the transferor, or where the transaction amounts to a consolidation or merger, or where the transferee corporation is merely a continuation of the transferor corporation, or where the transaction is entered into fraudently in order to escape liability for such debts. Fletcher, Private Corporations, § 7122, et seg. If defendant can show such circumstances the Assignment of Claims Act is no bar to recovery.
UNION INDUSTRIES, INC.
70. Prior to June 15, 1945, when Manufacturers Trading Corporation began to finance Union Industries, Inc., upon assignment of the proceeds of its Government contracts, R. Green Annan, its president, and John E. McKelvy, its vice president and secretary-treasurer, owned approximately 99.7 percent of Union’s capital stock (7,278 shares of 7,300 outstanding) .
It was organized under the laws of the State of Maryland about March 1, 1864, as Union Mining Company of Allegheny County, and by a charter amendment March 14,1945, its corporate title was changed to Union Industries, Inc.
All of the capital stock of Canonsburg Steel & Iron Works (referred to hereinafter as Canonsburg), which was originally organized as a Pennsylvania corporation about August 2, 1902, was acquired by Union January 31, 1944. On *375 August 31, 1944, Union took oyer the assets of Canonsburg and thereafter operated it as a division of Union.
All of the capital stock of Amsler-Morton Company, (hereinafter sometimes referred to as Amsler-Morton) which was originally organized as a Pennsylvania corporation about April 3, 1918, was acquired by Union on May 5, 1944. On October 31, 1944, Union took over the assets of Amsler-Morton and thereafter operated it as a division of Union.
The capital stock of Pennsylvania Industrial Engineers, Inc., which was organized as a Pennsylvania corporation about May 26, 1933, was acquired by Union May 31, 1944. On October 31,1944, Union took over the assets of Pennsylvania Industrial Engineers and thereafter it was operated as a division of Union.
Union also acquired all of the capital stock of Amsler-Morton International, Inc., May 5, 1944, and held minor interests in associated companies.
Union was primarily engaged in the performance of Government contracts during 1945, but its business also consisted of engineering, manufacturing and installing work for commercial customers.
During the five-year period 1940 to 1944, the combined sales of Union and its operating divisions were $42,970,706, of which $18,273,329 were made during 1944. For the same period its net operating income was $2,011,561, of which $1,597,866 was earned during 1944. At the end of 1944, its capitalization consisted of $745,500 of common stock, and earned surplus of $19,195.24. The surplus account had been reduced at the end of 1944, by the loss of $2,129,063.84 on the sale of real estate, plant and equipment, consisting of its brick plant at Mt. Savage, Maryland.
MANUFACTURERS TRADING CORPORATION
71. Manufacturers Trading Corporation (hereinafter called MTC) was a commercial finance company, doing commercial banking, collateralized by open accounts receivable, merchandise, warehouse receipts and liens on machinery and equipment. During the ten-year period from 1937 through 1946, MTC handled commercial business of approximately $273,568,305. In June 1945, MTC’s working funds consisted *376 of approximately $1,000,000 from preferred stock, $300,000 from common stock, $250,000 in its surplus account and about $3,750,000 of funds borrowed from banks.
During 1945, and throughout the period herein pertinent, Alfred H. Sachs was president of MTC. At the end of 1944, Sachs owned approximately 53.6 percent of the common stock, and by 1947 had increased his holdings, together with that of his family, to approximately 63.5 percent. Sachs voted his shares in MTC for the election of directors of his choice.
72. Andrew H. Blass, together with his wife and children, was the owner of the entire capital stock of the Pittsburgh Finance Corporation (referred to hereinafter as Pittsburgh Finance), a financial institution with offices in Pittsburgh, Pennsylvania.
73. Chester A. Bolles, until sometime in the summer of 1945, was practically the sole owner of a company known as Continental Industries, Inc. On or about June 15, 1945, Union Industries, Inc., engaged Continental Industries to manage and operate Union. Certain of Continental Industries’ officers acted in behalf of Union, and James G. Murray, Jr., was listed as its new president in Union’s 1945 income tax return, with a salary payment of $1,500.
74. On or about June 12,1945, the Globe Corporation (referred to hereinafter as Globe), was organized at the instance of Alfred H. Sachs, Chester A. Bolles and Andrew II. Blass, with offices at Pittsburgh, Pennsylvania.
Its sole stockholders were Alfred H. Sachs, with paid in capital of $6,000, representing 40 percent, Chester A. Bolles, with paid in capital of $4,500, representing 30 percent and Mrs. Florence F. Blass and children, with paid in capital of $4,500, representing 30 percent, or a total of $15,000 of capital.
Globe’s directors, D. S. Thomas, It. E. Jackson, and L. J. Bolshouse, held the first meeting June 12, 1945, and elected D. S. Thomas as president and treasurer, and K. E. Jackson as secretary of the corporation.
As of June 15, 1945, Globe acquired substantially all of the capital stock of Union by purchase from R. Green Annan *377 and John E. McKelvy, concurrently with a number of other transactions and agreements hereinafter described.
75. The only adjusted financial statement of Union, prior to June 1945, was an audit for 1944, reported by Main and Company April 6, 1945. The current or liquid assets of Union as of December 31, 1944, consisted of $671,785.80 in cash, receivables, inventory, and other items totaling $2,174,309.74. The current liabilities, including a provision for Federal and State income and excess profits taxes of $326,886.34, and a provision for renegotiation of Government business of $263,598, totaled $1,604,082.84, which indicated a net working capital of approximately $570,000.
The current liabilities of $1,604,082.84 at December 31, 1944, did not include a reserve for credits due the United States of $465,601.57, which substantially offset the net working capital above. Neither were deferred accounts and notes payable of $559,765.04 included with current liabilities. This item included $305,000 of bank loans payable after 1945, and $243,617.05 due McKelvy, which was replaced by a mortgage loan of $400,000 about March 1, 1945.
This audit report revealed that the operation of Union’s brick plant at Mt. Savage, Maryland, resulted in substantial losses during the years 1942, 1943, and 1944, and because of its uneconomical operations, this plant was sold in December 1944, at a loss of $2,129,063.84. The audit reported that the tax loss resulting from this sale would exceed the operating profits for 1944, with an undetermined loss carryover against 1945 operations.
This audit also reported expenditures of $515,703.48 to December 31, 1944, upon the construction of a new brick plant at Grantsville, Maryland, with an estimated eventual expenditure of $750,000 to complete it.
By letter of April 24, 1945, Main and Company advised the president of Union Industries, Inc., that the estimated carryover losses for 1945 were calculated at $348,000, and that the company would be entitled to an additional excess profits credit of approximately $252,400 in 1945; and on the basis of such calculations that $348,000 of 1945 earnings would be free of normal Federal taxes, and $600,400 of such earnings would be free of excess profits taxes.
*378 INTERIM FINANCING
76. On February 8, 1945, Union borrowed $300,000 from the Colonial Trust Company of Pittsburgh under a loan agreement restricting the use of such funds to the performance of its war production contracts or to the payment of Federal income and excess profits taxes. The bank received an assignment of Union’s contract NOrd-5923, with a balance of $4,096,943.20 due and to become due thereon, to secure said loan. This agreement was executed by E. Green Annan, president, John E. McKelvy, secretary-treasurer, and G. B. McDowell, Jr., treasurer, respectively, of the Union Mining Company.
The Colonial Trust Company also received an agreement by John E. McKelvy to subordinate the indebtedness of Union to him in the amount of $246,867.05, to any and all indebtedness of Union to the bank.
77. Under a loan agreement dated February 14,1945, with the Colonial Trust Company, Union obtained a revolving credit in the maximum principal amount of $500,000, and pledged its contracts NOrd-7426, NOrd-7510 and NOrd-5923, having amounts due and to become due thereon in the sum of $9,877,373.20.
John E. McKelvy, who obtained a mortgage for $400,000, secured by the brick plant under construction by Union at Grantsville, Maryland, about March 1, 1945, assigned this mortgage to the bank to secure its loan to Union.
Union issued its demand loan note to the bank for the $300,000 loan, at the rate of 5 percent. It was paid in full about June 20, 1945, under the refinancing through MTC, as hereinafter described.
78. On or about June 8, 1945, Samuel Kaufman, attorney for Union, met with Alfred H. Sachs in the latter’s office in Cleveland to discuss the preparation of documents necessary to carry out transactions previously negotiated by E. Green Annan, covering the sale of Union’s capital stock owned by Annan and McKelvy and the sale of certain assets of Union. In that conversation Sachs made mention of the proposal to provide for adequate financing of Union for the performance of its Government contracts.
*379 On or about June 15, 1945, various transactions were consummated, pursuant to agreements reached prior to that time. These agreements and transactions are set forth in findings Nos. 79 through 83, following herein.
79. On June 15, 1945, the Globe Corporation purchased all of the stock of Union Industries, Inc., held by Annan and McKelvy at $43 per share for the sum of $312,954. Payment was made by Globe on the same day. This purchase was financed by Globe in the manner following:
June 15, 1945, Pittsburgh Finance issued its check to Globe, upon a demand loan note without interest, for the sum of $315,000.
June 15,1945, MTC issued its check to Pittsburgh Finance, in the amount of $250,000 on open account, with “collateral notes”. Pittsburgh Finance repaid $170,000 on this account with its check dated June 16, 1945, but the check was not deposited for collection by MTC until June 21, or until Pittsburgh Finance received repayment, in part, of its loan to Globe.
On June 18, 1945, Globe received Union’s check for $200,000 in payment for $200,000 par value debentures of Globe due in five years at 5 percent. These debentures were signed by D. S. Thomas, as president of Globe Corporation, and Union’s check to Globe was signed by its treasurer G. B. McDowell, Jr., and by D. S. Thomas, as secretary. On June 19,1945, Globe, in turn, paid $200,000 to Pittsburgh Finance on its note of $315,000, together with a $500 payment as a service charge. On June 20,1945, Globe made a further payment to Pittsburgh Finance of $15,000, leaving a balance of $100,000 on its loan.
Pittsburgh Finance made the final payment of $80,000 on its loan from MTC with its check dated August 3, 1945, but the check was not deposited for collection until August 14, 1945, when Pittsburgh Finance had received final payment on its loan from Globe.
August 13,1945, Globe received $100,000 from Union, for $100,000 additional debentures issued by Globe. Union’s check was signed by E. C. Well and G. B. McDowell, Jr., listed as new and old treasurer in Union’s 1945 tax return.
On the following day, August 14, 1945, Globe made its *380 final payment of $100,000 on its loan to Pittsburgh Finance. Globe also paid an additional service charge of $500 to Pittsburgh Finance on August 25,1945. Pittsburgh Finance paid MTC $400 on its loan from MTC.
From the foregoing it appears that Globe purchased the stock of Union from Annan and McKelvy from funds received from Union upon debentures issued by Globe, plus the $15,000 paid in capital of Globe. But in the interim, beginning June 16,1945, MTC began to finance Union with large advances of funds, totaling $712,407.02 for June; $711,340.34 in July, and $1,004,161.86 during August 1945, which, after credits for repayments of $1,403,440.37, left a balance of $1,024,468.85 due MTC from Union by the end of August 1945.
Also on August 13, 1945, concurrently with the payment of $100,000 by Union to Globe for its 5 percent debentures, the three shareholders of Globe, Sachs, Blass and Bolles, participated in the financing of Union by MTC, through Pittsburgh Finance, to the extent of $100,000, as reported in finding 84.
The foregoing transaction was duly approved by the board of directors of Globe. D. S. Thomas, a Pittsburgh attorney, who was employed to organize Globe, had been counsel for Blass since about 1925, and received most of his instructions from him, as president and treasurer of Globe and secretary of Union. After Globe had bought Union it had cash assets of less than one thousand dollars.
80. On June 15, 1945, Union entered into a factoring agreement, represented by Carroll M. Snyder, as “(President, partner or owner)” and D. S. Thomas as secretary, with MTC, represented by Alfred H. Sachs, pursuant to which Union agreed to assign all satisfactory receivables, and MTC agreed to advance approximately 75 percent thereof by way of loans with service charges at the rate of l/30th of 1 percent per day of the cash balances outstanding. Thereafter MTC advanced sufficient moneys to Union to pay off the loan at Colonial Trust Company by June 20 (findings 76 and 77 herein).
Pursuant to this factoring agreement MTC made cash advances to Union in the aggregate sum of $4,630,613.20, *381 which, together with charges for payments of expenses and accounts for Union, totaled $4,986,141.14. Service charges against Union’s account to November 30, 1950, totaled $499,751.41. Collections from Union totaled $4,354,177.06, and the unpaid balance at November 30, 1950, was $1,131,715.49.
81. Under an agreement made at Pittsburgh on June 15, 1945, between Union and John E. McKelvy, Union agreed to pay off its loan to the Colonial Trust Company, for the release of the bank’s collateral, including the mortgage assigned by McKelvy, and McKelvy, in turn, agreed to release the mortgage of $400,000 on the Grantsville brick plant, and to receive in exchange $200,000 in cash, and two $100,000 notes, due in one and two years at 5 percent. These notes were secured by the assignment of certain patents owned by Union to McKelvy.
All of these patents were reassigned by McKelvy to Union, and held in escrow until the payment of the aforesaid notes, with the exception of the foreign rights on certain soaking pit patents, which were not subject to Union’s contingent rights.
82. Union had expended approximately $870,600.10 on the construction of a brick plant at Grantsville, Maryland, over a period of about one and one-half years, to June 15, 1945, including the $400,000 advanced by McKelvy, and secured by a mortgage on the same as described in the preceding-finding. The plant was incomplete and its construction had been delayed by reason of Government priority orders. In his first discussion with Union’s counsel June 8, 1945, Sachs considered the sale of this brick plant, an airplane owned by Union, and other assets not required in the performance of Union’s Government contracts. The matter had also been discussed with K. Green Annan, who suggested that E. J. Bognar, Union’s vice president, would purchase the plant for $100,000. After Sachs discussed with Blass and Bolles the price for the plant, Sachs, Blass and Bolles, the new owners of Union’s stock through Globe corporation, agreed to the sale. ft. Green Annan and John E. McKelvy were the actual purchasers, and the property was conveyed to them by the following transactions:
*382 By an agreement between Annan and McKelvy witb E. J. Bognar, the latter agreed to purchase the brick plant at not to exceed $100,000 and reconvey the same to Annan and McKelvy. This agreement recited, in part, the following:
* * * Annan and McKelvy desires to buy for one hundred thousand dollars ($100,000.00) the partially constructed brick-making plant of the corporation at Grantsville, Maryland, but Union Industries, Inc., is unwilling to sell to them. Annan and McKelvy have requested that Bognar buy the property without disclosing to the seller that he is acting on their behalf and Bognar has agreed to do so, * * *
The evidence indicates that Sachs and his associates had agreed to sell the plant to Annan and McKelvy, and that Bognar was used as intermediary. The true nature of the transaction was not disclosed to Bognar.
On June 16, 1945, this brick plant was conveyed by deed to E. J. Bognar for $100,0000. Bognar, in turn, conveyed the brick plant by deed of June 24, 1945, to the Union Fire Brick Company, a Maryland corporation, for $100,000, so that no public record of this transaction carried the names of Annan and McKelvy.
The book loss sustained by Union in the disposition of this brick plant was approximately $770,600.10. Sachs had information indicating the plant was worth about $100,000.
83. At about the same time, Union sold the brick inventory, with a book value of approximately $52,762.41, for $20,000, thereby sustaining a book loss of $32,762.41; also an airplane, carried at an approximate book value of $22,000 was sold to Annan or McKelvy for $10,000, resulting in a book loss of $12,000 to Union.
84. On or about August 13,1945, and concurrently with the purchase by Union of $100,000 of Globe debentures reported in finding 79, the stockholders of Globe participated in a loan to Union in the sum of $100,000 through MTC, with Pittsburgh Finance acting as their agent without liability or interest in the transaction. The money was paid over to Pittsburgh Finance in the amounts of $40,000 by Sachs, $30,000 by Blass, and. $30,000 by Bolles. Pittsburgh Finance, in turn, issued its check dated August 14, 1945, to *383 MTC. MTC issued its check to Union for $200,000 August 13, 1945, with instructions by Sachs to D. S. Thomas, acting for Union, that the said check of $200,000 was in escrow and was to be delivered to Union concurrently with the deposit by Pittsburgh Finance of the $100,000 participating loan, and the payment of the $80,000 balance due MTC from Pittsburgh Finance on its loan of $250,000 of June 15,1945, in MTC’s account at the Colonial Trust Company in Pittsburgh. The deposit was made August 14, 1945, and the $200,000 check to Union was received by Union the same day.
The agreement between Pittsburgh Finance and MTC, was that MTC would advance the $100,000 participating loan to Union along with its own advances, would collect the same service charge on it as on its other funds advanced and would pay over to Pittsburgh Finance 75 percent of service charges accrued thereon and collected from Union; but that the said $100,000 loan would be subordinated to the collection of all principal advances by MTC and all service charges in connection with such advances by MTC.
As evidence of their advances of $100,000 to Union in the above manner, Sachs, Blass and Bolles each received a “bearer” promissory note by Pittsburgh Finance for the respective sums advanced by them, payable only from the proceeds of collections from Union Industries, Inc., or from the liquidation of collateral assigned by it for the payment thereof pursuant to a non-recourse participating agreement between Pittsburgh Finance and MTC.
No part of the principal sum was repaid by Union on the advances by shareholders of Globe.
During the period from August 1945 to January 1947, MTC remitted to Pittsburgh Finance $13,325, representing 75 percent of the service charges collected from Union on the $100,000 outstanding balance during that period, and this sum was remitted by Pittsburgh Finance to Sachs, Blass and Bolles in proportion to their respective advances, or in the approximate sums of $5,330, $3,997.50, and $3,997.50. In 1947, when Union’s assets were being liquidated, Sachs received $14,000 from the purchaser of Union’s patents and *384 there is some indication in the record that the estates of Blass and Bolles probably received proportionate settlements for the release of their respective liens against such patents.
The shareholders of Globe recovered less than one-half of their advances of funds to Union.
85. Prior to the consummation of the financing agreement between Union and MTC on June 15, 1945, Sachs made considerable investigation into the financial condition of Union. He was furnished an interim balance sheet for Union as of April 30,1945, and L. H. King, vice president and director of MTC, acting as auditor for MTC, also made a study of Union and reported to Sachs on the same. Sachs prepared a memorandum of his studies and investigations, and scheduled therein questionable assets totaling $1,139,211.87.
Questionable assets included $767,004.70 for the uncompleted brick plant at Grantsville, Maryland, and other property, after an allowance for recovery of $100,000 thereon, goodwill of $166,870.40, investments and accounts with affiliated companies of $171,731.05 and other minor items. A revised balance sheet was prepared by Sachs with the elimination of questionable assets, as of April 30, 1945, wherein a current deficit of $400,830.67 was determined (“but subject to further impairment in the event of additional federal income tax and renegotiation assessments).”
86. Sachs relied upon the representations in the 1944 audit that the losses on the sale of property would preclude any tax assessments for that year, and that the loss carryover, together with losses resulting from the disposition of Union’s brick plant and other property in 1945 would also avoid tax assessments for 1945. Income and excess profits taxes during those years would amount to as much as 70 percent of income before taxes.
Sachs also relied upon the ability and competence of Blass and Bolles to manage Union’s operations profitably. Both of these associates were killed in an airplane accident in October 1945.
87. Sachs was not furnished an interim operating statement of Union for the 1945 period to June 15, but discussed the current status of operations with the management and *385 with his associates, Blass and Bolles. Sachs knew that the Canonsburg division had sustained operating losses in April 1945 of approximately $100,000, by reason of labor difficulties. Union sustained operating losses for the period January to May 1945, of approximately $220,000, and for the 6-month period ended June 30, 1945, its operating losses totaled approximately $483,000.
Union’s income tax return for 1945 reflected a consolidated loss of $1,323,158.77, of which $679,246.15 represented the net loss on the sale of property during the year. The net loss on the sale of property included the loss on the sale of the brick plant at Grantsville, Maryland, the airplane and other property, offset, in part, by a gain of approximately $115,000 upon the sale of certain of the patents owned by Union.
88. Following the termination of its war contracts, Union continued operations for about one and one-half years. Its work consisted largely of the construction and installation of soaking pits for steel mills. The Amsler-Morton Division completed its UNRRA contract for $248,375 by the end of 1946, for which no payment was received. Its operations ceased early in 1947.
Thereafter MTC liquidated Union’s accounts and other assets under its factoring agreement and its advances on collateral notes. All of the business of the Amsler-Morton Division and the patents were sold to a corporation organized by Murray, subject to liability for unpaid payrolls of approximately $100,000, and liens against the patents by Pittsburgh Finance for the benefit of Sachs, and the estates of Blass and Bolles, which were the subject of direct settlement.
89. As a result of the refinancing agreement between MTC and Union heretofore set forth, and the various agreements and transactions consummated at about the same time, the following results were obtained:
The former shareholders of Union Industries, Inc., R. Green Annan and John E. McKelvy, received $312,954 for their stock in Union; they acquired the uncompleted brick plant and other assets from Union at a discount from the book values thereof of approximately $815,000, and McKelvy *386 received settlement in full of Ms advances of $400,000 to Union wliich were secured by the mortgage on the brick plant.
MTC made advances to Union under its factoring agreement and collateral notes of approximately $5,000,000, upon which it sustained a loss of approximately $1,131,715, including service charges amounting to approximately $499,751.
Sachs, Blass, and Bolles recovered less than one-half of the $100,000 of funds advanced to Union under a participating agreement with MTC. This money was included in the total advances made by MTC above noted. Neither Sachs, Blass nor Bolles received from Union directly any moneys or compensation for managerial or other services they may have rendered.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff Hadden, Trustee for Manufacturers Trading Corporation, is entitled to recover as follows: in Case No. 49884, $63,000; in Case No. 413-52, $231,276.61 with interest as provided by law; in Case No. 50115, $8,879.83; and in Case No. 48867, $248,375; that the United States is entitled to recover $248,375 in Case No. 48867 as an offset in the amount of plaintiff’s claim in that case, and it is therefore adjudged and ordered that plaintiff Hadden, Trustee for Manufacturers Trading Corporation, recover of and from the United States the net amount of three hundred three thousand one hundred fifty-six dollars and forty-four cents ($303,156.44).
Upon the foregoing premises the court also orders that in Case No. 49831 the plaintiff Union Industries, Inc., and the defendant United States have opportunity to signify an intention to present proof on the claim and counterclaims in that case, and it is further ordered that if the parties do not signify such an intention within thirty days, the claim and counterclaims in Case No. 49831 will be dismissed. 

 The defendant also asserted counterclaims against MTC directly. Of these counterclaims the first counterclaim In Case No. 49884 and the fourth In Case No. 48867 are for unpaid taxes of MTC. Defendant appears to have abandoned these In view of the subsequent certificate of overassessment Issued to MTC in 1951. At. a later point in the opinion we will discuss the other counterclaims which the defendant asserts against MTC directly.